Number 051545 Massachusetts Eye v. Novartis Ophthalmics Mr. Herrmann Counsel, please come forward Mr. Herrmann, proceed when you are ready May it please the court, the invention of the 303 patent which is in suit here made clinically practical the first use of photodynamic therapy for the treatment of age-related macular degeneration, which is the leading cause of blindness in adults. Two doctors at the Massachusetts Eye and Ear Infirmary, Drs. Miller and Grigudis, conceived and reduced to practice the use of irradiances as high as 1,200 milliwatts per centimeter squared in that treatment. Before that work, those skilled in the art believed that irradiances above 200 milliwatts per centimeter squared would cause unacceptable thermal damage. Miller and Grigudis proved that this was not so. They applied for and they received a patent on their work. The patent claims an irradiance range of 300 to 900 milliwatts per centimeter squared with a preferred irradiance of 600 milliwatts per centimeter squared. Mr. Herrmann, I'd like to direct you to the district court's opinion on this reported 353, that's up at 176. This is the section in which the district court stated its conclusions with respect to questions of material fact. And I'll give you just a minute to get there. This is where the court concluded that there were no undisputed facts and listed those undisputed facts. Is that page 11 of the appendix, Your Honor? Let me just make sure we're on the same page, literally. Almost. All right. Page A15 in the appendix. Yes. I believe. A15, and you'll see there that the court says. I'm sure we've got the same text here. Yes, the bottom several lines. Court rules that the undisputed facts clearly and convincingly show that Dr. Levy conceived of the upper end of the irradiance range because, one, Dr. Levy insisted that Dr. Miller test 900 milliwatts per square centimeter. Is there any dispute over that? Yes, there is, Your Honor. Wasn't that clearly the subject of the admission in response to question 115? Well, let me answer that in two parts. One could argue that we did admit that she insisted. However, we explained to the district court that we were simply admitting that she had testified that way, that there was no corroboration for that fact. More than that, we also incorporated into that response a list of documents that reflect the sequence of events that we believe happened, which lead to the infirmary's position that the 900 milliwatts per centimeter squared actually came from a meeting in Boston at which Mr. Salvatore and Dr. Miller were present. And QLT did its own internal investigation to determine where the protocol came from. A fair reading of that internal investigation is that it came from Miller, not QLT. And then we also listed in that response, which we incorporated into the response Your Honor is referring to, a reference to the letter which Mr. Salvatore sent to Dr. Miller saying, here is the protocol that we agreed on at the meeting. So that the evidence is that the protocol came from a meeting in which two people were present. Dr. Levy was not present. The contemporaneous record shows that it didn't come from Salvatore. It came from Miller. So our position is that the judge has read far more into our admission than was really there. We said that in court, explained that we were simply admitting that she had testified, not that it was so. QLT acknowledged in the interview. Well, of course, your admission doesn't say that. I understand that, Your Honor. And that's why I say it may be that we're stuck with that admission. But we also asked the court to allow us to amend our answers once it became clear that we weren't on the same page here. And more than that, QLT understood that this was our position because they say it in one of their papers, that they understand that MEI is taking the position at the briefing below, that the protocol came from Dr. Miller at the meeting. All right. The next undisputed fact that the district court stated and relied on was that Dr. Miller had never tested 900 milliwatts per square centimeter before collaborating with QLT. I take it you dispute that. We do not dispute that. She had not, in fact, tested 900 milliwatts per centimeter squared. So that's not an issue before us. Only in the sense that the judge concluded that if you didn't test 900, you couldn't conceive 900. And he relied on some testimony from our patent law expert, which he just got wrong. She was asked a question of, if you test 300 and 600, is that a conception of 900? And she said, well, no, because you've only tested 300 or 600. And the judge just read that into, therefore, you have to test 900. She also testified that if one conceives a range, they actually have the invention of everything within the range. And she was never asked the question, if you've tested 300, 600, and 1,200, does that capture 900? So the judge just misread her testimony and relied too much on the fact that an actual test had not been assessed. This was at a deposition? This was at a deposition. So it was submitted along with affidavits in the summary judgment? Well, there were no affidavits. It was submitted. The affidavit just said, here's the testimony. But the testimony was submitted. So you're talking about he's making findings. He wasn't making any findings, was he? It was a summary judgment. Well, we believe he made findings. For example, he found that the highest irradiance which could be safely used was 900 milliwatts per centimeter squared. And there's absolutely no evidence of that whatsoever. The evidence is, and it's said in the patent, that you could use up to 1,800 milliwatts per centimeter squared. The tests that he talks about show that you can have no damage up to 1,800 milliwatts per centimeter squared and that it's effective up to 1,200 milliwatts per centimeter squared. The judge essentially made findings that those tests were not successful, that they were irrelevant. And he did that in the face of testimony to the contrary. For example, he said that some of those tests were run on normal eyes. And he said, therefore, you can't rely on those. Well, three QLT witnesses testified that testing on normal eyes is part of the way you do this. Testing on normal eyes is referred to in the patent. Dr. Miller had also tested diseased eyes and normal eyes in monkeys and concluded that they were parallel in terms of their responses. So the judge is reading this and finding that he believes that the tests were not successful. Notwithstanding that they're reported in the patent as successful, they were reported to QLT as successful. That's a fact finding. At a minimum, it's a plainly disputed issue of fact. We believe the evidence is clear that the tests were successful. So that's really, I think, the last point that the district judge referred to, the last three lines here on page A15. 900 milliwatts per square centimeter is the highest irradiance level at which petitioner may safely administer photodynamic therapy. Your Honor, there's not a shred of evidence that I know of that's true. And, in fact, I believe QLT doesn't even cite any. It was a statement made during argument. The district court picked it up. The evidence is clear that you can go above 900 and be safe. It says it in the patent, and that's what the Miller test showed. At that point, without asking you to go outside of the record, what roughly had been established as the optimum balance in terms of the number of milliwatts? Dr. Miller preferred irradiance with 600. And after doing her higher irradiance tests, she recommended 600 as the optimum number. There were then discussions back and forth between Miller and QLT, and a protocol is developed which contains irradiances of 300, 600, 900. And she goes ahead and tests those. But she believed that 600 was the preferred range. That's what's in the patent. That's what the FDA approved. But in terms of an optimum range, the patent says you can do up to 1800. Typically, people do up to 900. My preferred embodiment is 600, which is what the FDA approved. Was there anything in the record that at 900 or that Dr. Levy foresaw some sort of special characteristics at that range? None whatsoever, Your Honor. Dr. Levy was not a person familiar with PDT in the eyes. There is in the record a transcript of conversation that she had with Dr. Miller in which she expressed surprise at the results that Dr. Miller was getting. 900 is simply a number. There's no evidence at all that it has any value. It's simply between 600 and 1,200. It was the one number that Dr. Miller hadn't tested. She tested 300, 600, 1,200, 1,800. 900, if you will, was halfway in between. There's no evidence at all that anything happens at 900. It doesn't happen at 600 or 1,200. But the tests that were conducted by Dr. Miller at 1,200, 1,800, that whole range of tests conducted early on, those tests were conducted on healthy animals, correct? The higher radiance tests were conducted on healthy animals. There was also a test that was done before that with diseased animals and healthy animals. And Dr. Miller concluded, and this is in the record, that the reaction, if you will, or the effect in healthy animals and diseased animals, monkeys, was essentially the same. And more than that, as I said, three QLT witnesses testified that using normal animals is part of the program here, and in fact the patent discusses using normal animals. So it is true that she used normal animals, but she concluded from normal animals that you could use up to 1,200 effectively and safely, and up to 1,800 actually safely, in primates with disease. But why would the test results on the healthy animals, that certainly would establish that the treatment was not going to pose any sort of a threat or cause any damage, why would that provide any guidance whatsoever as to what the appropriate range should be in treating diseased animals? Well, when the eye is not diseased, the drug will not localize in the diseased veins because it isn't there. Therefore, it is sort of spread throughout the eye. You irradiate it, and you can tell whether or not the blood vessels close. That's efficacy. And if the blood vessels in the normal eyes close, then you know that the PDT treatment is working. In a diseased animal, because there are new blood vessels, the drug will localize in the diseased part selectively, and you hit that, and it will destroy those blood vessels. But the effect of destroying the blood vessels, or closing the blood vessels, I should say, in the normal eyes is the kind of thing that you look at, among others, to determine that this is going to be effective. And the difference between the two is that in the diseased eyes, the drug will basically go into the diseased area, so that if you're spread out beyond the diseased area, you won't get an effect. In normal eyes, it's more spread through the eye, and so you're basically getting the photodynamic effect on the eye. And so you determine at that point whether or not you're going to get effective closure. And Dr. Miller reports, yes, we get effective closure. And then she reports, and we don't get damage. And so she concludes that she's demonstrated both safety and efficacy up to at least 1,200 milliwatts per centimeter squared. Okay, let's hear from the other side. We'll save you a little time. Thank you. Mr. Ware. Thank you. Good morning, and may it please the Court. My name is Donald Ware, and I represent QLT, Inc. We also have counsel here from MGH and from Novartis, but we have agreed that I will speak on behalf of all three. Your Honor, there are two legal doctrines that apply here that we believe are determinative of this appeal. One is the principle that joint inventorship arises from contributions to the conception of subject matter that actually finds its way into the claim. In other words, the principle that contribution to any element is sufficient. In this case, as we know, the claim, as NEI chose to present the claim, was a claim to arrange a radiance range of 300 to 900 milliwatts per centimeter squared. But you see what's bothering me about this. We know that the basic concept was conceived over a range that encompassed the 900. And I'm trying to understand the difference between what Dr. Levy suggested and what not just any lab technician filling the gap, because this is a gap that either a patent examiner or maybe an FDA examiner might ask to be filled, but what any ordinary patent attorney would say. You need data over the range. And so Dr. Levy says we need some data in this range. If in fact something unusual had been discovered at the 900, we might have a different case as I see it so far. This is really where I'd like your view as well, but it looks primarily as if what she did is said, let's fill this gap. Maybe she didn't know what would happen if the gap were filled, but there's no doubt nobody has said that she made the basic invention. We're just talking about providing data in a space where there were no data. I think that the question presupposes that there was a conception of a broad range that was safe and efficacious and that this was arranged within it. But I don't think you're disputing that the conception went up to 1,200 anyway. Oh, very much so, because the evidence does not support that, and that's what the district judge spoke of. You're saying there were no tests, but in terms of the concept. No, it's that the protocol that was designed and proposed by Dr. Miller was a protocol. This was to test in liposomal BPD, which is a different formulation, and the proposal was only to go to 300 and 600. What Dr. Miller said was that in those early tests, and this is quoted by the district judge, so it's in his opinion, in the early tests they were looking. They wanted to go higher because it would shorten the treatment time, but they were looking for toxicity as you went higher. And what she found was that there was damage at 1,200 and damage at 1,800. She decided and she testified under oath that 600 was high enough. She'd seen hemorrhaging at the higher, at the 1,800. And so what you're hearing from MEI is attorney argument, but it's not actually based on the contemporaneous documents. The contemporaneous documents actually show that Miller only wanted to go as high as 600. So since Levy came along in collaboration, and there's no question about a collaboration, and changed the protocol and said, no, I think we can go as high as 900, let's get data up to 900, because Miller had already said you can't, that 1,200 and 1,800 had problems. But the problem at 1,200 was, isn't there testimony that the problem at 1,200 was really not significantly different than problems you would expect at any of the other ranges? Not actually. And this is the confusing part of the presentation by MEI. And I think what your Honor is thinking of is there was an early document from Miller in which she referred to angiographic results, and that's just taking a picture and looking at it. And she said it didn't look that different between 1,200 and 1,600, but that you needed to await the histology, where they actually take the tissue sections. And when she did that, she reported back in the later document in June, when she made the proposal to QLT as to what should be the protocol, she came back and she said that we saw damage to the retina, to the inner and outer retina. So she said, we're just going to propose 300 and 600. Now the other thing that I think has been left out here. The question here, of course, though, is we're talking about overcoming the normal presumption of correctness on inventorship, and we're talking about summary judgment. So your burden is about as high as they come. You've got clear and convincing, standard of proof. And on summary judgment, any questions of fact are to be considered or any questions are to be resolved in the favor of the non-movement. And you have to establish, given those parameters, that there is no genuine issue of material fact. And it seems to me that a lot of the things that we have been discussing just in the few minutes we've been here raise exactly the kinds of questions of fact that would preclude summary judgment. Well, we'd submit that they are not questions of fact that preclude summary judgment, and let me tell you why, for a couple of reasons. Of course, conception and inventorship are questions of law or the court. They can turn on underlying facts, but in this case they don't. And the underlying facts are not disputed because the underlying facts are documents, they're contemporary documents. What is unusual about this case is that Miller herself never came forward with any affidavit declaration in which she said, I conceived a range up to 1,800, I conceived a range to 1,200, I conceived a range to 900. She never said that. We've submitted a statement of facts in which we've said that this came from Levy. We said we presented all this. She did not present an affidavit. So she's somebody who is in control of those facts. But you filed a patent application, which you swore, as one does when you file a patent application. This is all behind us. You're saying that there needed to be duplication of those averments? No, no, no. I'm only saying that in responding to specific allegations that are made in summary judgment that MEI did not present an affidavit. Well, you already had her swearing that she made the invention for which it was one of the named inventors. But as to the specifics here, she did not come back, she did not dispute that Levy contributed the 900. And if the issue is the broader range, I'd like to make two legal points about that. First of all, it is not true under this Court's decisions that conception of a broader range necessarily is conception of everything within it. Subspecies, subgenus, species, all. That's why I asked if there were special properties at 900. Right. And the special property, this is what MEI chose to claim. This is what they concluded in the end that they could claim. That's not a special property. That's an upper limit. It's an upper limit of a range that is important to safety and efficacy. And they did not claim a higher range, and we have contemporaneous documents from Miller saying that the 1200 and the 1800 led to damage. The legal point, though, that I further wanted to make is, and this is an unusual fact about this case, and that is there was a double patenting rejection. The district judge mentioned this. There was an earlier patent that referred to irradiating the tissue and the examiner in the initial office action rejected the claims of the 303 saying that the earlier patent covered all ranges that were supported, all irradiances that were supported, as a matter of written description, by the 349 patent. MEI came back and MEI said, no, we are claiming 300 to 900. This is patentably distinct from broader ranges. So they made that representation that 300 to 900 had special meaning for patentability. And so this is the range that they claimed was a new invention. And under those circumstances, it seems to us that a person who admittedly contributes to the upper end of that range that they chose to claim has made a contribution to the claim as they presented it to the patent office. But the district court said that it was because Dr. Levy insisted. And I gather that that raises questions as to what that means. If you insist to run an experiment because there's a space that you think regulatory authorities will want you to fill, if you run it because you want to see what the upper limit is, I'm trying to understand how that insistence turns one into the inventor of a concept that you've been presented with by someone else. Well, she's not the sole inventor. It's a contribution. But the point is she did want to see what the upper limit was. Miller had said that 1200 and 1800 were too high. She came back with a proposal to test only at 300 and 600. That was going to be the protocol going forward for the liposomal formulation of BPD when they actually got to testing it in disease tissue. So Miller wanted to do it at 300 to 600. This is a case, I think, where the conception comes out of design. In other words, Levy wanted to try a higher upper limit than Miller did in the experiments going forward. Those would be the first experiments, by the way, in which disease tissue would be tested. And I want to make very clear that there is a difference between normal tissues and disease tissues in terms of the testing, and the patent itself recites this. It's in column 10, lines 42 to 45, and it says that the photodynamic therapy of normal choroidal tissue can demonstrate the effect on adjacent structures, but the treatment of choroidal neovasculature in disease tissue is what demonstrates efficacy. So those experiments in 1992 were preliminary experiments. We cited in our brief the Burroughs case, and the point that we're making there is that there was still a lot of experimentation to go before one could conclude what actually was a safe, effective, and selective upper bound for this range. So the 1992 experiments contributed to this. They provided some data, but there was still a lot to learn. They knew nothing about the liposomal formulation of BPD. That had not been tested at all. And they had not tested any of these higher irradiances in disease tissue. And there are questions not only of whether there is damage, they refer to thermal damage, which is just heat, but there are questions of whether at that high an irradiance, whether it works effectively, because you get light scattering when you go that high. And so in a case where you have continued experimentation that everyone agrees needs to be done, they don't know the answers yet, they haven't solved the problem that they set out to do, this is a key part of inventorship. Had they solved the problem, had Miller solved the problem in 1992? No, they had a lot of experiments to go. And another case that is important here, I think, Sewell v. Walter case, one of the points that's made is that when you're looking at subsequent experiments and you're thinking about, as a matter of law, was there conception at this earlier point, when you know that there were subsequent experiments, well, if there were subsequent experiments and they were directed to the subject matter that actually is claimed in the patent, that's a strong indication that there was not a prior conception. You know, the longer you talk, the more certain I become that the court got it wrong by deciding summary judgment in this case. We're talking about all kinds of facts that have to be found, and he more or less found them himself without the proper fatigue. Well, I don't think so, because the facts, and we started off, as Judge Lynn started off, the facts were undisputed, the fact that it was Levy who insisted on the 900, that that is the actual range that they claimed. To have conception, you have to have conception of every feature of what you've actually claimed. And in this case, there was no evidence coming forward that Miller had a conception of this range of 300 to 900. And there was no evidence from her, there wasn't testimony from her, that she had a range in mind up to 1,200 or 1,800. All of this is a returning argument. Every laboratory technician, if someone says, see what happens as you go out to the outer limits, would be a joint invention. It will, I would think, change completely how scientific research is done in an industrial context. If everybody who gets their hands on an experiment acquires ownership of the rights, then, as opposed to the rules which have been, as you know, more rigorously drawn, you see scientific papers with 20 or 30 joint authors, in order to accommodate that, but that doesn't make them inventors as well. Can I just answer the question? I see my time is about up. There's no question in this case that this was a collaboration. That was admitted also. And the nature of this collaboration was to try to optimize the parameters. And the conception that they refer to is merely based upon designing experiments that were not complete, didn't provide complete answers. We know they didn't answer anything for liposomal. We know they didn't answer anything for disease tissue. So it's a process of experimentation. And the people who are collaborating, it's a very small collaboration, very small number of scientists, are contributing their ideas about how to design an experiment. And then they're carrying out the experiment. And it may be that until the experiment is actually even completed, that there's not a complete conception. But in any case, we're talking about contributions of a very small number of people, an interaction between a couple of scientists as to what should we test. And so the simple stepping back from all of it, I think that if we, and to answer, to come back to Judge Mayer's comment. Right, I think you need to wrap it up. Yeah, but to come back to Judge Mayer's comment, in this case, what was claimed was 300 to 900. And Levy's contribution to that is not disputed. And the other arguments about prior conception just fail as a matter of law, because Levy did contribute to the upper end, not just the 900, by the way, 600 to 900. They would have stopped at 600. We have your argument. Thank you. Okay, would you extend the time as much as Mr. Ware ran over? Four minutes or so, five, okay. Just a couple of points, Your Honor. First of all, I think it's clear that we do dispute that Levy contributed 900. Mr. Ware did say there's no dispute about that. We certainly dispute it. And our position also is that even if she insisted on 900, which we dispute, nevertheless, the invention was conceived before she suggested that, and it was reduced to practice before she suggested that, and so the invention is Miller's. Let me turn to some of the facts, and I believe that they are facts. Mr. Ware said that there was damage shown at 1,200 and 1,800. Well, the report was that the maximal damage was at 600 and 1,800. 600 is the FDA-approved range. This is a laser shining in eyes. There's always some damage. That's what the patent said. There's not a shred of evidence that there was treatment-limiting damage, if you will, at 1,200 or treatment-limiting damage at 1,800. The evidence is to the contrary, and the patent reports that. So whether or not damage was seen, damage is always seen. The question is, is it significant damage? The answer is no. Mr. Ware talks about angiographic results, and he says, well, you can't rely on those. That's how you do this treatment, actually, in humans, is you do angiography. If it's good enough for humans, it's good enough for Dr. Miller to rely on. Mr. Ware said that there's no evidence, that we put in no evidence about where 900 came from. Well, I repeat, we did. We put in the QLT internal report, which basically, in effect, says it didn't come from us, QLT. We put in the letter from Salvatore saying, this is what we agreed on, Dr. Miller, at the meeting. Miller was there, Salvatore was there. More than that, Miller testified that she believed the protocol came from the meeting and that 900 wasn't Salvatore's idea. Mr. Ware talked about double patenting. Well, first of all, that wasn't argued below, I don't believe, but in any event, we weren't arguing that 300 to 900 is special range. We were arguing that a radiance is higher than 200, or what the invention was, that prior to the time that Dr. Miller and Dr. Kogutis did this, people would not go above 200. They did. They're the ones that showed it worked. They're the ones that made this a practical invention. Mr. Ware says that the patent says that you don't use normalized to test the efficacy. Well, in column 12 of the patent, it talks about effective chloreocapillaris closure in normal coloroids. In other words, this is a way of proving efficacy. At a minimum, whether or not Dr. Miller had shown it, is certainly a disputed issue of fact. We believe she proved it. Now, Mr. Ware says that she didn't want to test 900. She proposed originally testing 300 to 600. That's because she'd concluded that 600, in answer to your question, Your Honor, was her preferred value. She didn't see any reason to testing something higher because she'd already tested it. This is my speculation, I can see. But she'd already tested 1200 and 1800. And if she knew 1200 and 1800 worked, she certainly knew 900 worked. She wanted 600. Mr. Ware has talked about liposomes. Well, there was no finding about liposomes, and the evidence is crystal clear that even QLT believed that liposome was not an embedded feature. Their own documents say that. So to suggest here that somehow Dr. Levy should be an inventor because she provided some liposomal BPD is contrary to their own papers. Now, that's not really before us. That's right. This case comes to us in an unusual posture because there were, as I understand it, a number of issues raised with regard to a whole host of the limitations and the various claims in this patent as to inventorship not only by Dr. Levy, but inventorship by others as well. And the district court chose to decide this case on the very narrow issue of the upper limit of this range, this 900 milliwatts per square centimeter. That's correct, Your Honor. It's unusual in the sense that, and I'm concerned that if you win this battle, you may ultimately lose the war when it goes back on some of these other issues. It's a little bit of an unusual posture. Might it not have been better to allow the district court to flesh out all of these inventorship questions and reach one judgment on all of the inventorship issues before this individual piece was sent up here for appeal? Well, I'm not sure. I think our position was that he had decided on this narrow issue. We believed he was wrong. Because he decided on that narrow issue, it made QLT an owner of the patent, which effectively did away with the lawsuit. And so in that sense, it was a dispositive decision. And if that decision were to be affirmed, then the lawsuit effectively goes away. If that decision is not affirmed, then we will litigate the question of inventorship. And we continue to believe that this is a patent, the improvement of higher irradiances, which made this treatment possible. And that was Miller and Grigudis. That was not Levy. That was Miller and Grigudis. That's what the record shows. And they're entitled to their patent. And if we have to litigate the other inventorship issues, which I hope we do, we'll do that. Thank you, Your Honor. Thank you, Mr. Herman. And thank you, Mr. Ware. The case is taken into submission.